# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-0065

**STATE OF LOUISIANA**

**IN THE INTEREST OF E.R.**

************

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 2498-JAC
HONORABLE STEPHEN B. BEASLEY, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Jimmie C. Peters, Marc T. Amy, and Phyllis M. Keaty, Judges.

**AFFIRMED IN PART AND REVERSED IN PART.**

**Don M. Burkett**
**District Attorney**
**Eleventh Judicial District Court**
**P. O. Box 1557**
**Many, LA 71449**
**(318) 256-6246**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Kimberly S. Smith**
**State of Louisiana**
**Department of Children and Family Services**
**1525 Fairfield Avenue, 8ᵗʰ Floor**
**Shreveport, LA 71101**
**(318) 676-7347**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**D. Scott Kendrick**
**1762 Texas Street**
**Natchitoches, LA  71457**
**(318) 354-9146**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Mother of Minor Child, E.R.**

**Brian C. McRae**
**Post Office Box 612**
**111 N. Washington Avenue**
**Mansfield, LA  71052**
**(318) 872-2973**
**COUNSEL FOR APPELLANT:**
     **Minor Child, E.R.**

**Jason Waltman**
**551 Kings Highway**
**Shreveport, LA 71104**
**(318) 861-4394**
**COUNSEL FOR APPELLANT:**
     **Fathers of Minor Child, E.R.**

PETERS, J.

The mother and her minor daughter both appeal a trial court judgment rendered in favor of the State of Louisiana through the Department of Children and Family Services (referred to as the "state" or "DCFS") terminating the parental rights of the parents to the minor daughter. For the following reasons, we affirm in part and reverse in part.

## DISCUSSION OF THE RECORD

The minor child at issue in this litigation, E.R., was born on March 17, 2007, during the marriage of her mother, K.R. and her legal father, Eu.R.[1] However, Eu.R.'s brother, C.R., is E.R.'s biological father. This litigation has as its beginnings three emergency room visits over a four-day period in early April 2008.

The first emergency room visit was to the Rapides General Hospital Emergency Room in Rapides Parish, Louisiana. On that day, K.R. brought E.R. to the hospital after learning that Eu.R. had choked the child. On the next day, when E.R. began experiencing breathing difficulties and would not quit crying, K.R. took her to the Sabine Medical Center Emergency Room in Sabine Parish, Louisiana. Two days later, on April 11, 2008, K.R. and E.R. were again at the Sabine Medical Center Emergency Room because K.R. believed that Eu.R. had sexually assaulted E.R.[2] This particular event was so traumatic that K.R. caused she and E.R. to be transported by ambulance to the hospital.

These hospital visits were called to the attention of the State of Louisiana, Department of Social Services, Office of Community Services[3] in Sabine Parish on

_____

[1]The initials of the child and her parents are used to protect the identity of the minor child. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

[2]The sexual abuse assertion proved to be unfounded.

[3]Pursuant to La.R.S. 36:471, the Department of Children and Family Services (DCFS) was created in place of the Department of Social Services, effective July 1, 2010. All references to the

April 11, 2008, and the state's subsequent investigation revealed not only the particulars of the three emergency room visits, but a history of abuse to both E.R. and her half-brother, C.V., Jr.—all at the hands of Eu.R.[4]

Initially, DCFS allowed E.R. and C.V., Jr. to remain in their mother's home. However, on May 1, 2008, after learning that K.R. refused to enforce a restraining order against Eu.R., DCFS sought and was granted a temporary custody order from the trial court. A May 2, 2008 hearing resulted in a judgment granting DCFS continued custody of both E.R. and C.V., Jr. Thereafter on May 16, 2008, the state filed a petition seeking to have the children adjudicated as children in need of care. Following a hearing on June 30, 2008, the trial court adjudicated E.R. and C.V., Jr. as children in need of care and continued their custody in the care of the state.[5]

Even before the trial court adjudicated E.R. a child in need of care, DCFS had already begun to formulate a plan to address the issues raised by taking her into custody. On May 28, 2008, DCFS and K.R. entered into a case plan wherein the principal goal was stated as K.R.'s reunification with E.R., with a secondary goal of E.R.'s placement with a relative. As part of this initial case plan, K.R. agreed to participate in substance abuse evaluations and/or treatments, psychological evaluations and/or treatments, parenting and nurturing classes, and domestic violence and women's support groups. Additionally, she committed herself to obtaining and

state agency will be to its new designation, DCFS.

[4]DCFS learned from C.V., Jr., E.R.'s half brother, of other instances of physical abuse by Eu.R. toward E.R., and from K.R. that Eu.R. had beaten E.R. so severely two months before that the child had begun to suffer seizures. In coordinating its investigation with the Rapides Parish DCFS office, the Sabine Parish DCFS officials discovered that Rapides Parish DCFS had concluded on February 12, 2008, that a valid case existed for neglect/dependency by Eu.R. on C.V., Jr., but that it closed that case after transferring K.R. and her children to her parents' home in Sabine Parish on April 8, 2008.

[5]The custody of C.V., Jr. was eventually given to his father, C.V., Sr. Thus, his custody is not at issue in this litigation.

maintaining employment, to provide financial support to her children if called upon by the state, to provide transportation for herself and the children, and to cooperate with DCFS.[6] The trial court approved this case plan.

Thereafter, DCFS continued to maintain E.R.'s physical custody and provided the trial court with progress reports and proposed changes of the case plan. When DCFS provided the trial court with its case plan review prepared on November 19, 2008, K.R. had undergone a psychological evaluation by Dr. Daniel J. Lonowski, an Alexandria, Louisiana psychologist, and counseling sessions with Dr. Carol Jannick, a family counselor with Green Acres Counseling Services in Natchitoches, Louisiana, had completed her parenting class obligations, and was then attending her nurturing parenting classes. Despite this apparent progress, DCFS informed the trial court that while its primary goal remained reunification, its secondary goal had become adoption. DCFS's conclusions that K.R. continued to have problems with her mental and emotional health, her inability to understand the effect substance abuse has on her parenting abilities, her inability to understand the effect violence has had in her home, and in her lack of day-to-day parenting skills were based on the reports provided by Drs. Lonowski and Jannick and her instructor in the parenting class. With regard to Eu.R.'s participation in the reunification process, DCFS reported to the trial court that he had not attended any of the family team conferences and, at the time the report was prepared, his whereabouts were unknown.[7]

---

[6]A similar case plan was compiled for Eu.R., but he did not attend the family team conference where the particulars were discussed, and he never agreed to the terms of the plan.

[7]A progress report submitted to the trial court on August 15, 2008, noted that Eu.R. had been in contact with DCFS on May 28, 2008. On that day, he notified DCFS that he had just been released from the Rapides Parish General Hospital after attempting to commit suicide, that he was in the process of obtaining cheaper housing, and that he required transportation to visit E.R.

When DCFS submitted its next case plan review to the trial court on July 21, 2009, its goal had changed to take the steps necessary to make E.R. available for adoption. This change in direction was caused by K.R.'s continued lack of progress in rehabilitating herself. A February 6, 2009 progress report submitted to the trial court had noted that while K.R. had completed her participation in a women's support group for domestic violence, the class instructor was of the opinion that K.R. "did not comprehend what was needed to make a safe environment for her and her child." Additionally, although K.R. had completed her nurturing parenting class obligation, she demonstrated nothing to suggest that she comprehended or could demonstrate any of the skills learned in her classes. In the case plan review, DCFS requested a follow-up evaluation with Dr. Lonowski. Additionally, it noted that Eu.R. continued to be a non-participant in the case plan. The trial court subsequently accepted the new case plan goal of adoption and ordered a follow-up evaluation by Dr. Lonowski.

On May 21, 2010, DCFS submitted an updated case plan review to the trial court wherein it asserted that nothing had changed to alter its adoption goal, as K.R. had made little or no progress toward strengthening her argument for reunification with her daughter. On October 19, 2010, DCFS filed its petition seeking termination of the parental rights of K.R., Eu.R., and C.R. After a trial on the merits, the trial court rendered judgment terminating the parental rights of all three parties, maintaining E.R.'s custody in the state and freeing her for certification for adoption. The trial court signed a judgment to this effect on December 17, 2010, and both K.R. and E.R. have appealed. Both appellants raised the same two assignments of error: (1) that the state failed to establish by clear and convincing evidence that there was no reasonable expectation of reformation in the foreseeable future for K.R. [or in the

4

case of E.R.'s appeal, for Eu.R. and C.R. as well], and (2) that the state failed to prove by clear and convincing evidence that there has been no substantial parental compliance with the case plan.

**OPINION**

In *State in the Interest of J.A.*, 99-2905, pp. 7-9 (La. 1/12/00), 752 So.2d 806, 810-11, the supreme court summarized the general rules governing suits seeking the termination of parental rights as follows:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.*, 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of S.M.*, 719 So.2d at 452; *State in the Interest of A.E.*, 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir.1982).

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all

legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State in the Interest of A.E.*, 448 So.2d [183] at 185.

Title X of the Children's Code governs the involuntary termination of parental rights. LA. CHILD. CODE art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privilege of parents. The State need establish only one ground, LA. CHILD. CODE art. 1015, but the judge must also find that the termination is in the best interest of the child. LA. CHILD. CODE art. 1039. *See State in Interest of ML & PL*, 95-0045 (La.9/5/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. LA. CHILD. CODE art. 1035(A); *Santosky v. Kramer*, 445 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence).

The arguments on appeal are resolved by determining whether the state has proven by clear and convincing evidence, the grounds for termination of parental rights pursuant to La.Ch.Code art. 1015(5), which provides:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Lack of substantial compliance with a case plan is proven by:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

6

(3)     The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4)     The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5)     The parent's repeated failure to comply with the required programs of treatment and rehabilitation services provided in the case plan.

(6)     The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7)     The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Child.Code art. 1036(C).

In addressing the evidentiary question, we will address K.R.'s and E.R.'s appeals separately.

## K.R.'S APPEAL

The state asserts that more than one year has elapsed since E.R.'s removal frOm K.R.'s custody, that K.R. has failed to substantially comply with the case plan goals for reunification, and that there is no reasonable expectation of significant improvement in the near future. We find that the state has overcome its burden on these issues by clear and convincing evidence.[8]

As previously stated, very early in the reunification process, K.R. underwent a psychological evaluation by Dr. Lonowski. The doctor conducted his initial evaluation on June 9, 2008, and authored a report concerning his findings on June 11, 2008. In that report, Dr. Lonowski stated:

> The results of the psychological evaluation of [K.R.] support a primary clinical impression of antisocial personality traits. Profiles generated by

---

[8]Obviously, the one year period is not in dispute.

7

the various psychometric tests also support this impression. Her responses to the three psychometric tests showed that [K.R.] was unwilling or unable because of personality dynamics to disclose pertinent personal information. Such a pattern suggests that she is a distrusting individual who exhibits poor social judgment because of simplistic reasoning and borderline verbal intelligence, and therefore, she engages in repeated periods of self-defeating behavior. Her overall intellectual functioning is in the range of mild mental retardation. Because of her personality orientation, the examiner believes that [K.R.] cannot be trusted to do what she asserts that she will to comply with her case plan. Accordingly, she requires very close casework supervision, and even then, the [DCFS] can probably expect no more than marginal cooperation from [K.R.] While, theoretically, she might benefit from mental health counseling to help her develop better insight into her psychological dynamics, it is unlikely she would cooperate with such services, and therefore, no such recommendation is made at this time.

One year later, Dr. Lonowski's basic conclusions had not changed. In his June 7, 2009 report, Dr. Lonowski stated that his more recent testing revealed that K.R. had the intellectual capacity to raise children, but that she continued "to hold to rigid views and simplistic concepts that suggest that her social judgment and decision making could be compromised despite sufficient intellectual capabilities." He concluded that K.R. basically blamed the authorities for not giving her the appropriate consideration for having simply completed the courses despite the fact that she seemed not to benefit at all from the lessons presented. He further noted that when he last evaluated her, K.R. was in another relationship, was attempting to become pregnant, and that her "ability to responsibly take care of her children independently is questionable," but that "[i]f she had a responsible partner, the probability that she could engage in responsible parenting behavior would improve." Dr. Lonowski suggested that it might be beneficial for DCFS to develop a profile on her current

paramour to determine whether he would be a sufficiently responsible partner in raising children.[9]

Dr. Jannick began her counseling activities with K.R. not long after K.R. was first seen by Dr. Lonowski. In her August 5, 2008 outpatient treatment report, she stated that:

> Due to [K.R.'s] limited thought processing ability coupled with her antisocial personality traits, it is doubtful [she] will be able to change her belief that her son, [C.V., Jr.], is responsible for the children entering foster care. Even when confronted and presented with facts, she manages to "reassemble" them and conform them to her beliefs. In addition, if, on the outside chance, that she verbalizes a fact accurately, the next minute she reverts back to her original thought indicating no internalization of the thoughts/facts at hand. It is also doubtful [K.R.] understands the long-term consequences of the situation and I cannot predict she will ever comprehend past and future events associated with her case. She demonstrates very little insight in spite of the efforts by service providers to keep her advised and aware of the facts in her case.

As late as early 2010, Dr. Jannick was still working with K.R., but with little positive results. Although Dr. Jannick found that K.R. obviously cared for E.R. deeply, and was actually generally receptive to feedback, she was of the opinion that K.R. would require considerable supervision to meet the safety needs of E.R. According to Dr. Jannick, K.R. was still having difficulty transferring the knowledge or suggestions she received in her training sessions to real life situations. Dr. Jannick was of the opinion that K.R. is normally at a loss in addressing novel situations absent specific coaching on that situation.

Lindy Branch, a former employee of DCFS, was the original case worker on E.R.'s case when it began in May 2008, and was the person who collected the initial information concerning the three emergency room visits as well as the prior history

---

[9]At some point after Dr. Lonowski's second evaluation, K.R. and her latest companion separated and she reestablished her relationship with Eu.R.

of abuse giving rise to E.R.'s subsequent seizures. Additionally, Ms. Branch directly participated in the development of the rehabilitation case plans. According to Ms. Branch, K.R. attended all the required substance abuse and psychological evaluations. Additionally, K.R. met the attendance requirements at the parenting classes, nurturing parenting classes, women's support group for abuse, and weekly visitation with E.R. However, Ms. Branch testified that merely attending the assigned evaluations and classes did not equate to successfully completing the requirements of the programs. That is to say, despite being exposed to these core values, K.R. demonstrated no behavioral changes.

Ms. Branch testified that DCFS attempted to assist K.R. by providing additional parenting demonstrations, coaching, and interactions with the assistance of Dr. Jannick. However, according to Ms. Branch, K.R. still could not demonstrate a change in her behavior. As an example, Ms. Branch testified that while the assistant was in the room with her and E.R., K.R. would demonstrate the skills taught to her, but when the assistant left the room, K.R. would not interact or communicate with E.R. Instead, she would just sit on the couch and watch her.

With regard to visitation itself, Ms. Branch testified that although K.R. initially visited E.R. regularly, she made no visits between April 2010 through August 2010,[10] and other than two or three small gifts, she failed to provide any support for E.R. Ms. Branch further testified that K.R. failed to maintain a stable residence during her case plan in that K.R. had at least four residences. Some of these residences were shared with her paramour (with whom DCFS was unable to conduct home studies), and when that relationship ended, K.R. resumed her relationship with Eu.R.

_____

[10]Ms. Branch's employment with DCFS ended in August 2010.

According to Ms. Branch, E.R. is thriving in foster care. She explained that E.R. is a very active three-year-old, that she is talking more than previously, and that she appears to be on target both medically and physically.

LaJuana Williams Mosley, the supervisor of K.R.'s women's support group, parenting classes, and family visits, testified that she provided sixteen weeks of women's support group involvement to K.R. and that she supervised thirteen visits between K.R. and her children between May 2008 and September 2009. Ms. Mosley testified that the support group discusses domestic violence, how the participants can protect themselves and their children, lifestyle changes, and how to spot abusers. Although K.R. attended all sixteen weeks of the support group, she did not participate in the classes or volunteer any information. When questioned about K.R.'s mental ability, Ms. Mosley stated that her impression was that K.R. wanted people to believe that she was limited, but she stated that K.R. could spell really well and that she was able to comprehend what she wanted to comprehend.

In describing the interaction between K.R. and E.R., Ms. Mosley testified that if C.V., Jr. was present, K.R. would pay attention to him until E.R. arrived, then she would ignore him. According to Ms. Mosley, on one occasion when C.V., Jr. told K.R. three times that he wished to go home with her, K.R. responded by telling him it was his fault he was in the custody of the state and he should learn to deal with the situation.

Ms. Mosley testified that when the subject of protecting her children would arise, K.R. never verbalized how she would protect her children. Instead, K.R. would simply copy the language in a handbook addressing the definition of safety. Ms.

11

Mosley expressed concern that if K.R. insisted on reuniting with Eu.R., her priority would remain with that relationship rather than her relationship with her children.

Dr. Jannick testified she provided eight sessions of personal counseling to K.R. between July 2008 through September 2009, with a goal of improving K.R.'s ability to recognize safety concerns, address anger management and domestic violence issues, and improve her parenting skills. With regard to K.R.'s parenting skills, Dr. Jannick testified that she provided her reading material and watched and discussed videos with her. She opined that K.R. was conscientious during the counseling while she thought she would be reunited with E.R. However, she stated that once K.R. knew this would not occur, she became less cooperative in that she did not complete her assignments or interact during her counseling sessions.

According to Dr. Jannick, K.R. met the specific goals set for her during her interaction with E.R., but she only did what was expected of her. If something unexpected occurred, K.R. was at a loss as to how to deal with the situation. In fact, according to Dr. Jannick, K.R. has difficulty dealing with anything out of the ordinary and, since her experience with children is that most days are out of the ordinary, she would be concerned with K.R.'s ability to deal with anything unexpected. Finally, Dr. Jannick testified that she would be concerned if K.R. was reunited with E.R. because of K.R.'s inability to recognize dangerous situations or conditions. Nor did she feel that any amount of counseling would improve K.R.'s ability in this area.

K.R.'s nomadic life style and poor choice of companions was also a concern to all who testified. When the state took custody, K.R. was residing with her parents in the Pleasant Hill community of Sabine Parish. By November 2008, she had moved to a one-bedroom apartment in Zwolle, Sabine Parish, Louisiana. By June 2009, she

had moved from her apartment and was sharing a two-bedroom home with her new paramour. Sometime thereafter, she left her latest companion and reunited with Eu.R. C.R. testified at trial that as far as he knew, K.R. and Eu.R. were back together and residing in either Cheneyville (Rapides Parish) or Bunkie (Avoyelles Parish), Louisiana.

Shirley Conley, a foster care worker for DCFS who was assigned E.R.'s case in August 2010, stated that K.R. had visited E.R. five times since she became involved in this matter. While she had the opportunity to see all three parents, she did not become aware that K.R. had returned to Eu.R. until C.R. told her. When she confronted K.R. concerning this issue, K.R. admitted that she was living with Eu.R. in Avoyelles Parish. Ms. Conley testified that because K.R. had not volunteered the fact that she and Eu.R. had resumed their relationship, no home study had been performed.

In terminating K.R.'s parental rights, the trial court stated that the principal, but not exclusive, reason for rendering its judgment was the lack of substantial improvement on her part in that she failed to exhibit or demonstrate behavior changes even after participating in the required classes and working her case plan. After considering the entire record, we find no error in the trial court's finding in this regard. While on the surface it may appear that K.R. has complied with the majority of her case plan, we find that substantively, she has failed to comply with the case plan as there has been no improvement in the behavior which led to her losing custody of E.R. in the first place. Both Dr. Jannick and Ms. Mosley opined that K.R. is incapable of providing a safe environment for E.R. This is based on her inability to recognize dangerous conditions or situations confronting her or E.R. This has been

borne out by K.R. reuniting with Eu.R., despite the abuse Eu.R. meted out to E.R. Moreover, K.R. is incapable of extrapolating knowledge learned from her sessions and applying it in situations not specifically covered. This is despite receiving additional help through parenting demonstrations, coaching, and interaction with Dr. Jannick. As pointed out by Dr. Jannick, parenting constantly involves dealing with extraordinary situations. An inability to cope with situations out of the ordinary does not bode well for a parent. Accordingly, we find that DCFS proved by clear and convincing evidence that grounds exist for terminating K.R.'s parental rights pursuant to La.Child.Code art. 1015(5) and that it is in E.R.'s best interest that K.R.'s parental rights are terminated. The trial court's judgment on this issue is affirmed.

## E.R.'S APPEAL

This appeal presents an unusual situation in that neither Eu.R. nor C.R. have appealed to preserve their parental rights. However, we will address the merits of E.R.'s arguments.

### K.R.'s Parental Rights

For the reasons previously stated in considering K.R.'s appeal on this issue, we reject this portion of E.R.'s argument and affirm the trial court's termination of K.R.'s parental rights.

### Eu.R.'s Parental Rights

The evidence in the record establishes without dispute that Eu.R. failed to attend court-approved visitations with E.R., failed to communicate with E.R., failed to keep the state apprised of his whereabouts; failed to contribute anything to the costs of E.R.'s foster care, failed to comply with the required programs provided for in the case plan, failed to show any substantial improvement in redressing the

14

programs preventing reunification with E.R., and continued conditions that led to the removal in the first place. In other words, Eu.R.'s failures meet every condition set forth in La.Child.Code art. 1036(C).

Based on the record before us, we find that the state proved by clear and convincing evidence the grounds for termination of Eu.R.'s parental rights pursuant to La.Child.Code art. 1015(5) and that it is in the best interest of E.R. that Eu.R.'s parental rights be terminated. We affirm the trial court's judgment on this issue.

### C.R.'s Parental Rights

Ms. Branch testified that she first learned of C.R.'s involvement in this matter after she was contacted by Eu.R. in March 2010. She testified that when she contacted C.R., he admitted that he was aware of the possibility that he was E.R.'s father because K.R. told him from the beginning that he might be the child's father. Although DNA testing confirmed that C.R. was E.R.'s biological father, Ms. Branch testified that he was not a placement resource for E.R. because his parental rights to another child had previously been terminated in Rapides Parish, Louisiana.

According to Ms. Branch, DCFS developed a case plan for C.R. similar to that developed for K.R. and Eu.R., but that he did nothing to comply with the case plan. However, she admitted that she never scheduled a psychological evaluation, parenting classes, or a substance abuse evaluation for C.R. before her employment ended and she had no idea whether any DCFS representative did so after she left. Ms. Branch testified that she spoke to C.R. four or five times after she learned of his possible involvement in this matter and that he voluntarily participated in the DNA testing and even attended the family team conference held after it was learned that he was E.R.'s biological father.

15

According to Ms. Branch, when the DCFS office became aware that C.R.'s parental rights had been terminated as to his child in Rapides Parish, he was told that he would not be considered a placement source for E.R. However, she did inform him that he could comply with the case plan if he wished, and she suggested that he schedule his parenting and nurturing parenting classes and substance abuse counseling in Rapides Parish as that was where he worked. According to Ms. Branch, C.R. never expressed a wish to visit with E.R. from the time she was taken into custody, despite knowing that she might be his child.

Ms. Conley testified that once C.R. was notified that he was E.R.'s biological father, he attended and participated in the family team conference, was given a case plan, twice visited E.R., and called DCFS seeking a referral for the services associated with his case plan. Ms. Conley testified that she provided him the phone number for the Alexandria substance abuse clinic and that she personally contacted the Rapides Parish DCFS to inquire about parenting and nurturing parenting classes for him. According to Ms. Conley, C.R. had provided her with documentation showing that he had completed a substance abuse evaluation with no recommendation of treatment. However, she said this information has not yet been verified. Finally, she testified that he has been persistent in his dealings with DCFS since the last court hearing.

C.R. testified that he was told by K.R. when she first became pregnant that he might be E.R.'s biological father. However, he stated that after she told him he was not the father, he left the matter alone. C.R. testified that he did not become aware that E.R. was in the state's custody until after the DNA testing when he was contacted by DCFS. At that point, he informed DCFS that he would do anything required in

order to get custody of E.R. Unfortunately, according to C.R., he received mixed information from DCFS when he delivered that message. At first, he was told not to contact DCFS, that the office would contact him. When he began attending meetings, he was told by Ms. Branch that he could follow his case plan but that regardless of his participation, DCFS would not consider him for placement of E.R. Further, C.R. stated that he was told by the Rapides Parish DCFS that he could not participate in any parenting classes until the Sabine Parish DCFS transferred his paperwork. However, he stated that he did undergo a substance abuse assessment on his own. C.R. testified that he has visited E.R. twice since April 2010, after receiving permission from DCFS, and he said that his wages are being garnished for child support. C.R. stated that he has been employed as a bus driver for six years, that he lives by himself, but that he has three sisters who could assist him with E.R. if necessary. Finally, he stated that he wants to remain involved in E.R.'s life and that he does not want his parental rights terminated.

C.R. admitted that his parental rights to another child were terminated and that the child was removed from his house because of physical abuse. He further admitted that he did not work a case plan in that instance.

Louisiana Children's Code Article 1015(3) provides an additional ground for the termination of a parent's rights:

> Misconduct of the parent toward this child or any other child of the parent or any other child in his household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
>
> . . . .

17

> (k) The parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse and prior attempts to rehabilitate the parent have been unsuccessful.

In order to satisfy the burden under Article 1015(3)(k), the state must prove two things by clear and convincing evidence: (1) that C.R.'s parental rights to a sibling of E.R. were terminated due to neglect or abuse and (2) that prior attempts to rehabilitate C.R. have been unsuccessful. *State ex rel. L.B. v. G.B.B.*, 02-1715 (La. 12/4/02), 831 So.2d 918.

After reviewing the record, we find that the state has failed to prove by clear and convincing evidence, the second prong of La.Child.Code art. 1015(3)(k): that prior attempts to rehabilitate C.R. have been unsuccessful. Although C.R. testified that K.R. informed him of the possibility that he was E.R.'s father, he stated that she later told him that Eu.R. was her father. Thus, he did not know he was E.R.'s father until it was confirmed by the DNA testing. Once that occurred, C.R. complied with his case plan to the best of his ability, despite being told by DCFS that he would never be considered as a placement resource for E.R. Although the state has proven that C.R.'s parental rights to another child were previously terminated in Rapides Parish, this, in and of itself, is insufficient to prove that termination is proper under Article 1015(3)(k). DCFS has not given C.R. a chance to comply with his case plan as he has only been involved in this matter for a mere eight months. Accordingly, we find that the state failed to prove by clear and convincing evidence the grounds for termination of C.R.'s parental rights exist pursuant to Article 1015(3)(k). Furthermore, we find that it has failed to prove that it would be in the best interest of E.R. that his parental rights be terminated. The trial court's judgment on this issue is reversed and the matter is remanded to the trial court for further proceedings.

## DISPOSITION

For the foregoing reasons, we reverse the trial court judgment terminating the parental rights of C.R. and remand the matter to the trial court for further proceedings on that issue.   We further affirm the trial court judgment terminating the parental rights of K.R. and Eu.R.  The costs of this appeal are assessed to K.R.

**AFFIRMED IN PART AND REVERSED IN PART.**